UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>U.S. Attorney's Office<br>555 Fourth Street, NW<br>Washington, DC 20530<br><br>Plaintiff,<br><br>v.<br><br>CESTA D. NEWMAN,<br>229 SW Main Blvd.<br>Lake City, Florida 32025<br><br>- and -<br><br>NEWMAN BROADCASTING, INC.<br>(f/k/a ABC Media, Inc.),<br>229 SW Main Blvd.<br>Lake City, Florida 32025<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Civil Action No. 16-1169<br>)<br>)  JURY TRIAL DEMANDED<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## UNITED STATES' COMPLAINT AND JURY DEMAND

COMES NOW the United States of America ("United States" or "Government"), by and through its undersigned counsel, files this Complaint against Defendants Cesta D. Newman ("Cesta Newman" or "Ms. Newman") and Newman Broadcasting, Inc. (formerlyCE known as ABC Media, Inc.) ("Newman Broadcasting") and alleges as follows.

1.      This is an action brought by the United States to recover treble damages and civil penalties under the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq*., and to recover damages under the common law theories of breach of contract and unjust enrichment.

2.      Cesta Newman and Newman Broadcasting falsely and fraudulently obtained recognition of Newman Broadcasting as a designated woman-owned business, thereby receiving

a "new entrant bidding" credit from the Federal Communications Commission (the "Commission" or "FCC") valued at approximately $910,700.

3.      Specifically, Defendants submitted an application (FCC Form 175) to the Commission to construct a radio station.  On that application, Defendants identified Newman Broadcasting (then known as ABC Media) as a woman-owned business for designated entity status and sought a "new entrant bidding credit".  In so doing, Defendants certified that no other entity or person had an interest in Newman Broadcasting that would vitiate the defendants' eligibility for designated entity status and a new entrant bidding credit.  Defendants' certification was false.

4.      On their application, Defendants also expressly represented that Cesta Newman's husband, the late John R. Newman ("John Newman" or "Mr. Newman") and his company, Newman Media, Inc. ("Newman Media') had no involvement or interests in Newman Broadcasting, and that Newman Broadcasting and Cesta Newman had no involvement or interests in Newman Media.

5.      These certifications were false.  In actuality, John Newman -- who had a lengthy career in radio broadcasting -- had substantial involvement with Newman Broadcasting and Defendants submitted their application so that John Newman and Newman Media could avoid paying the full value of the FCC license for the new radio station.

6.      Thereafter, to hide their misrepresentations and to avoid remitting sums attributable to the new entrant credit Newman Broadcasting received from the FCC, Defendants continued to make false statements and provide the Commission false records in the form of periodic certifications on FCC Form 175s.  That is, although John Newman's role with Newman Broadcasting increased after it obtained initial approvals from the FCC, Defendants continued to

represent to the Commission that Mr. Newman and Newman Media had no control over or any attributable interest in Newman Broadcasting or the radio station it ran (WJTK).

7.      From the application phase (or before) through a period when WJTK was on the air, Mr. Newman exercised control over Newman Broadcasting and WJTK in addition to two radio stations that he already owned in the same area (WNFB and WDSR).   Newman Broadcasting was thus not entitled to designated entity status or a new entrant bidding credit. The Commission incurred single damages of or around $910,700 due to defendants' fraudulent conduct.

## JURISDICTION, VENUE, AND PARTIES

8.      This Court has subject matter jurisdiction over this action under 31 U.S.C. §§ 3729 to 3733.

9.      This Court has personal jurisdiction over Ms. Newman and Newman Broadcasting because they transact business, including with the Commission, in the District of Columbia.

10.      Venue is proper in this District pursuant to 31 U.S.C. § 3732(a), and under 28 U.S.C. §§ 1391(b) and 1395(a).

11.      Plaintiff the United States of America, through the Federal Communications Commission, is responsible for regulating interstate and international communications by radio, television, wire, satellite and cable in all 50 states, the District of Columbia and U.S. territories.

12.      Defendant Cesta Newman is an adult female and President and Licensee of Newman Broadcasting.

13.      Defendant Newman Broadcasting is a Florida corporation with its principal address in Lake City, Florida.   Newman Broadcasting was organized as a media, communications, and education company.

## STATUTORY AND REGULATORY FRAMEWORK

### I.   THE FALSE CLAIMS ACT.

14.    Originally enacted in the 1860s to combat fraud against the Union Army during the Civil War, the FCA is the primary tool with which the United States combats false claims and fraud against the Government and protects the public fisc.

15.    The FCA provides for the award of treble damages and civil penalties for, among other acts, (i) knowingly or recklessly submitting, or causing the submission of, false or fraudulent claims for payment to the United States Government, (ii) knowingly or recklessly using a false record or making a false statement material to a claim, and (iii) knowingly or recklessly concealing or failing to disclose obligations to pay the Government.

16.    The FCA, as amended by the Fraud Enforcement and Recovery Act of 2009 ("FERA"), provides, in part, that anyone who:

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; . . . or
>
> (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,
>
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted [for inflation] . . ., plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a)(1)(A)-(B), (G).

17.    For purposes of the FCA, "the terms 'knowing' and 'knowingly' -- (A) mean that a person, with respect to information -- (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of

the truth or falsity of the information; and (B) require no proof of specific intent to defraud[.]" 31 U.S.C. § 3729(b)(1).

18.     Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (note), and 64 Fed. Reg. 47099, 47103 (1999), the FCA civil penalties were adjusted to a range of $5,500 to $11,000 per violation (*i.e.,* for each false claim, false record, or false statement) for violations occurring on or after September 29, 1999.

19.     The FCA was amended pursuant to FERA.   Pursuant to its terms, the FERA amendments to the false statement provisions (31 U.S.C. § 3729(a)(1)(B)) were retroactive and apply to all claims in this action.   FERA's other amendments were effective as of the date of enactment, May 20, 2009.   As applied to this matter, and except as noted herein, the FERA amended FCA is largely consistent with the pre-FERA FCA, and thus, solely for convenience, the Government cites herein the current version of the statute unless otherwise noted.

## II.     THE COMMUNICATIONS ACT.

20.     As noted above, the Federal Communications Commission, an independent U.S. government agency, is responsible for regulating interstate and international communications by radio, television, wire, satellite and cable in all 50 states, the District of Columbia and U.S. territories.

21.     As part of the Omnibus Budget Reconciliation Act of 1993, Pub. L. No. 103-66, § 6002, 107 Stat. 312, 387-392, Congress added Section 309(j) to the Communications Act of 1934, as amended (the "Communications Act"), authorizing the Commission to award licenses for rights to use the radio spectrum through competitive bidding.   Section 309(j)(8)(A) of the Communications Act requires revenues derived from an auction be deposited in the Treasury.

22.     Section 309(j) of the Communications Act mandates that the Commission "ensure that small businesses, rural telephone companies, and businesses owned by members of minority groups and women are given the opportunity to participate in the provision of spectrum-based services."  47 U.S.C. § 309(j)(D)(4).

23.     Section 309(j)(3)(B) directs the Commission, in establishing eligibility criteria and bidding methodologies, to promote "economic opportunity and competition . . . by avoiding excessive concentration of licenses and by disseminating licenses among a wide variety of applicants, including small businesses, rural telephone companies, and businesses owned by members of minority groups and women," which are collectively referred to as "designated entities."  47 U.S.C.  § 309(j)(3)(B).

24.     The FCC adopted the "new entrant" bidding credit to promote opportunities to designated entities consistent with congressional intent.  *In the Matter of Implementation of Section 309(j) of the Communications Act – Competitive Bidding for Commercial Broadcast and Instructional Television Fixed Service Licenses*, 1st Report & Order, 13 FCC Rcd. 15920,  ¶ 189, 1998 WL 483588 (Aug. 18, 1998); *see also* 47 C.F.R. § 1.2110(f)(1).

25.     "A winning bidder that qualifies as a 'new entrant' may use a bidding credit to lower the cost of its winning bid on any broadcast construction permit."   47 C.F.R. § 73.5007(a)(2005.

26.     "[A]ny winning bidder asserting new entrant status must, of course, have de facto as well as de jure control of the entity claiming the bidding credit."   *In the Matter of Implementation of Section 309(j) of the Commc'ns Act - Competitive Bidding for Commercial Broad. & Instructional Television Fixed Serv. Licenses Reexamination of the Policy Statement on Comparative Broad. Hearings Proposals to Reform the Commission's Comparative Hearing*

*Process to Expedite the Resolution of Cases*, 14 FCC Rcd. 8724, 8762 ¶ 71, n. 117 (1999), *review denied*, *Orion Commc'ns Ltd. v. Fed. Commc'ns Comm'n*, 221 F.3d 196 (D.C. Cir. 2000) (unpublished) (citations and footnotes omitted).

27.     "The Federal Communications Commission analyzes de facto control issues on a case-by-case basis.  In determining whether an entity has de facto control of an applicant or a licensee in the broadcasting service, the Commission has traditionally looked beyond legal title and financial interests to determine who holds operational control of the station.  The Commission, in particular, examines the question of who establishes policies governing station programming, personnel, and finances." *See Shareholders of Hispanic Broadcasting Corporation*, Memorandum Opinion and Order, 18 FCC Rcd. 18834, 18843 (2003).

28.     A "new entrant" winning bidder and/or its owner with no "attributable" interest in any other media or mass communications receives a 35% bidding credit.   47 C.F.R. § 73.5007(a).  A "new entrant" winning bidder and/or its owner with an interest in no more than three mass media facilities receives a 25% bidding credit.  *Id.*  "No bidding credit will be given if any of the commonly owned mass media facilities serve the same area as the proposed broadcast or secondary broadcast station . . . ."  *Id.*  "The new entrant bidding credit is not available to a winning bidder if it, and/or any individual or entity with an attributable interest in the winning bidder, have an attributable interest in any existing media of mass communications in the same area as the proposed broadcast or secondary broadcast facility." *Id.* § 73.5007(b).

29.     Notably, the "owners of a winning bidder include those individuals or entities who have an attributable interest in the winning bidder."  14 FCC Rcd. at 8762 ¶ 71 (1999). Additionally, "the interests of the winning bidder (and of any individuals or entities with an attributable interest in the winning bidder) in other media of mass communications [are]

attributable for purposes of the new entrant bidding credit to the same extent that such other media interests are considered attributable for purposes of [applicable] broadcast multiple ownership rules." *Id.*; 47 C.F.R. § 73.3555 Note 2.

30.     Prior to a broadcast auction, the Commission "issue[s] a public notice announcing the upcoming auction and specifying the period during which all applicants seeking to participate in an auction, . . ., must file their applications for new broadcast facilities. . ." 47 C.F.R. § 73.5002(a).

31.     "To reduce the burden on bidders and the Commission, and to minimize the potential for delays," broadcast applicants are required to submit only a short-form application [FCC Form 175] prior to any auction, and only winning bidders need to complete long form applications for AM, FM, and television stations. *In re Implementation of Section 309(j) of the Communications Act – Competitive Bidding for Commercial Broadcast and Instructional Television Fixed Service Licenses*, 1st Report & Order, 13 FCC Rcd. 15920,  ¶ 141 (Aug. 18, 1998); *see also* 47 C.F.R. §§ 73.5002(b), 73.5005(a).

32.     "Within thirty (30) days following the close of bidding and notification to the winning bidders, each winning bidder must submit [the] appropriate long-form application. . .for each construction permit or license for which it was the high bidder." 47 C.F.R. § 73.5005(a).

33.     Long-form applications filed by winning bidders are required to include the exhibits required by: (1) 47 C.F.R. § 1.2107(d) "concerning any bidding consortia or joint bidding arrangements"; (2) 47 C.F.R. § 1.2110(j) "concerning designated entity status, if applicable"; and (3) 47 C.F.R. § 1.2112 "concerning disclosure of ownership and real party in interest information, and, if applicable, disclosure of gross revenue information for small business applicants." *Id.*

34.     Relevant here, "[d]esignated entities must describe on their long-form applications how they satisfy the requirements for eligibility for designated entity status, and must list and summarize on their long-form applications all agreements that affect designated entity status such as partnership agreements, shareholder agreements, management agreements and other agreements, including oral agreements, establishing, as applicable, de facto or de jure control of the entity."  47 C.F.R. § 1.2110(j).

35.     With regard to transfer or assignment of licenses, the Communications Act provides in relevant part that no "station license, or any rights thereunder, shall be transferred, assigned, or disposed of in any manner, voluntarily or involuntarily, directly or indirectly, or by transfer of control of any corporation holding such permit or license, to any person except upon application to the Commission and upon finding by the Commission that the public interest, convenience, and necessity will be served thereby." 47 U.S.C. § 310(d).

36.     Also, "[a] licensee that utilizes a bidding credit, and that during the initial term seeks to assign or transfer control of a license to an entity that does not meet the eligibility criteria for a bidding credit, will be required to reimburse the U.S. Government for the amount of the bidding credit, plus interest based on the rate for ten year U.S. Treasury obligations applicable on the date the license was granted, as a condition of Commission approval of the assignment or transfer."  47 C.F.R. § 1.2111(b)(1).

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

37.     On November 1, 2005, the Commission commenced an auction of 171 construction permits in the FM broadcast service throughout the United States and the U.S. Virgin Islands ("Auction 62").  *See* Public Notice, Auction of FM *Broadcast Construction Permits Scheduled for November 1, 2005, Notice and Filing Requirements, Minimum Opening Bids, Upfront Payments and other Procedures for Auction No. 62*, 20 FCC Rcd. 10492 (FCC

Med. Bur. & Wireless Tel. Bur. June 17, 2005) (Report No. AUC-05-62-B) ("Public Notice for Auction 62"); *Public Notice, Removal of FM Broad Construction Permit from FM Auction No. 62*, 20 FCC Rcd. 12478 (FCC Med. Bur. & Wireless Tel. Bur. July 25, 2005) (Report No. AUC-05-62-C); *Public Notice, FM Broadcast Auction Start Date Rescheduled for January 12, 2006*, 20 FCC Rcd. 14720 (FCC Med. Bur. & Wireless Tel. Bur. Sept. 21, 2005) (Report No. AUC-05-62-D).

A.     **Regulatory Requirements Set Forth in the Notice for Auction 62 Described the Criteria to be Eligible for a Bidding Credit.**

38.     The Public Notice for Auction 62 stated that prospective bidders must be familiar with the rules related to broadcast auctions and competitive bidding procedures contained in Title 47, Part 1, Subpart Q, and Part 73, Subpart I of the Code of Federal Regulations.  *See* Public Notice for Auction 62 at 3, 20 FCC Rcd. at 10497.

39.     The Public Notice for Auction 62 also stated that prospective bidders must also be thoroughly familiar with the procedures, terms and conditions contained in the public notice on the auction, as well as, among other provisions, those in the *Broadcast First Report and Order* (13 FCC Rcd. 15920) the *Broadcast First Reconsideration Order* (14 FCC Rcd. 8724), and the *New Entrant Bidding Credit Reconsideration Order* (14 FCC Rcd. 12541).  *See* Public Notice for Auction 62 at 3, 20 FCC Rcd. at 10497.

40.     Auction 62 included a New Entrant Bidding Credit for broadcast auction applicants with no, or very few, other media interests.  Specifically, a 35 percent bidding credit was given to a winning bidder if it, and/or any individual or entity with an attributable interest in the winning bidder, had no attributable interest in any other media of mass communications as defined in 47 C.F.R. § 73.5008.  *See* Public Notice for Auction 62 at 15, 20 FCC Rcd. at 10509.

41.    A 25 percent bidding credit was given to a winning bidder if it, and/or any individual or entity with an attributable interest in the winning bidder, had an attributable interest in no more than three mass media facilities as defined in 47 C.F.R. § 73.5008.  *Id*.

42.    Under Auction 62, "no bidding credit [would be] given if any of the commonly owned mass media facilities serve the same area as the proposed broadcast station, as defined in 47 C.F.R. § 73.5007(b), or if the winning bidder, and/or any individual or entity with an attributable interest in the winning bidder, has attributable interests in more than three mass media facilities."  *Id.*

43.    Under Auction 62, attributable interests were determined according to the traditional broadcast attribution rules.  *See* Public Notice for Auction 62 at 14, 20 FCC Rcd. at 10508; 47 C.F.R. § 73.3555 n.2.   Spouses' media interests would not be attributed where the spouses' disclosures confirmed that such media interests were independently held and were not subject to common influence or control.  *In the Matter of: Clarification of Comm'n Policies Regarding Spousal Attribution*, 7 F.C.C. Rcd. 1920 (1992); *see also* Public Notice for Auction 62 at 14, 20 FCC Rcd. at 10508 n.61.

44.    Further, any bidder asserting New Entrant status was required to have de facto as well as de jure control of the entity claiming the credit, *id.* at n.64.

45.    Bidders were reminded that events occurring after the short-form application deadline, such as the acquisition of an attributable interest in another media entity, could result in diminishment or loss of the bidding credit and must be reported immediately.  *Id.* at 14, 20 FCC Rcd. at 10508.

46.    Unjust enrichment provisions applied to any winning bidder that used a bidding credit and later sought to assign or transfer control of the license or construction permit to an

entity that did not qualify for the credit, *id.* at 15-16, 20 FCC Rcd. 10509-10 (citing 47 C.F.R. § 73.5007(c)).

47.     Bidders were also required to disclose the real party or parties-in-interest to their application. *Id.* at 19, 20 FCC Rcd. at 10513.

48.     Those wishing to participate in the auction were required to submit a short-form application (FCC Form 175) electronically by August 12, 2005, and a sufficient upfront payment by September 30, 2005, as well as comply with all provisions in the Auction 62 Public Notice and applicable Commission rules. *See* Public Notice for Auction 62 at 10, 20 FCC Rcd. at 10504.

49.     For winning bidders, long form applications were due by March 10, 2006. *See* Public Notice for Auction 62, 21 FCC Rcd. at 1071.

50.     Winning bidders were required to submit the remaining balance of their winning bids – gross bids less any applicable new entrant bidding credit - within ten business days of the date of the Commission's public notice announcing that the Commission was prepared to accept a winning bidder's long form application. *See* Public Notice for Auction 62 at 41-42, 20 FCC Rcd. at 10536.

**B.     Cesta Newman, on Behalf Of Newman Broadcasting, Submitted A Successful Bid in Auction 62 and Made Representations During the Accompanying Bidding and Applications Processes In Support of a Claim for a Bidding Credit.**

51.     On November 23, 2005, Cesta Newman on behalf of Newman Broadcasting (then known as ABC Media) submitted its short form application (FCC Form 175) for Auction 62 along with an upfront payment of $70,000.   The application stated that Ms. Newman was President of the applicant.  On the application, Newman Broadcasting sought a new entrant credit of 35%.

52.     On February 8, 2006, Newman Broadcasting was announced as one of the winning bidders under Auction 62.  The amount of its winning bid was $2,602,000.

53.     On March 10, 2006, Cesta Newman on behalf of Newman Broadcasting submitted its long form application (FCC 301) for Auction 62.  On that form, Cesta Newman was noted as President, Director, and Stockholder of Newman Broadcasting.  Also, on that form, Cesta Newman on behalf of Newman Broadcasting certified, *inter alia*, that its proposed FM facility did not present an issue under the Commission's policies relating to media interests of immediate family members.

54.     As further explanation related to "Familial Media Interests," Cesta Newman on behalf of Newman Broadcasting stated the following:

> CESTA D NEWMAN IS PRESIDENT AND 100% STOCKHOLDER OF THE APPLICANT.  HER HUSBAND, JOHN R NEWMAN, IS PRESIDENT AND 100% STOCKHOLDER OF NEWMAN MEDIA, INC.  NEWMAN MEDIA, INC. IS THE LICENSEE OF TWO RADIO STATIONS THAT SERVE THE SAME MARKET AS THE PROPOSED STATION.  THEY ARE WNFB(FM) AND WDSR(AM), LAKE CITY, FLORIDA.  NEITHER CESTA OR JOHN HAS ANY INVOLVEMENT OR INTERESTS IN THE MEDIA ENTERPRISES OF THE OTHER.

55.     On Newman Broadcasting's Form 301, Cesta Newman certified that the "statements in the application [were] true, complete, and correct to the best of [her] knowledge and belief, and [were] made in good faith."  As part of the certification, she "acknowledge[d] that all certifications and attached Exhibits [to FCC Form 301] were considered material representations."

56.     On May 8, 2006, the Commission issued a public notice stating that it was prepared to grant certain Auction 62 construction permit applications.  Newman Broadcasting's application was included among those accepted.  In its May 8, 2006 public notice, the Commission set a deadline of May 22, 2006, for receipt of final payments of winning bids and

stated that it would grant construction permits upon receipt of timely final payment of winning bid amounts.

57.     Newman Broadcasting made timely payment of the final balance of its winning bid.  That is, Newman Broadcasting paid $1,691,300 representing its gross bid of $2,602,000 less the 35% new entrant bidding credit (or $910,700) it received based on the information and certifications in its applications.

58.     The Commission subsequently granted Newman Broadcasting's construction permit application on May 25, 2006.  The radio station was given the call sign "WJTK."

**C.     Defendants' Certifications During the Bidding and Applications Processes Were Materially False.**

59.     Prior to Cesta Newman's application, her husband, John Newman, through Newman Media, owned two radio stations serving Lake City, Florida -- an FM radio station with call sign "WNFB" licensed in October 1990 and an AM radio station with call sign "WDSR" assigned in December 1998.

60.     Contrary to the certification made on Newman Broadcasting's Form 301, John Newman was involved in Newman Broadcasting and WJTK during and before the application phase.

61.     John Newman, including through his company Newman Media, had control of or an "attributable interest" in Newman Broadcasting that would have resulted in Newman Broadcasting not receiving a new entrant bidding credit or designated entity status.

62.     In essence, the Newmans treated WJTK as a family enterprise rather than an independent entity controlled by Cesta Newman.  By way of examples, witnesses with firsthand knowledge confirm that:

a.    the construction permit application by Newman Broadcasting was submitted by or through Cesta Newman so that John Newman could avoid paying the full value of the license.

b.    John Newman and Newman Media were responsible for the physical set up of the radio station, WJTK.

c.    John Newman essentially ran all three radio stations, including Newman Broadcasting's WJTK.   For example, John Newman primarily or exclusively made personnel decisions, proposed consolidating sales staff of the separate companies, set advertising rates, and prepared and distributed weekly agendas for the three radio stations.

d.    John Newman conducted weekly staff meetings for Newman Broadcasting, which Cesta Newman only occasionally attended.

e.    Cesta Newman's involvement in Newman Broadcasting, and its station WJTK, was limited or "spotty" -- *e.g.*, she was involved in bookkeeping and participation in certain personnel decisions.

f.    The three radio stations (Newman Broadcasting's WJTK, and Newman Media's WNFB, and WDSR) shared staff and common management and jointly sold advertising.

63.    Defendants knowingly failed to report John Newman and Newman Media's true interests and involvement in Newman Broadcasting on Newman Broadcasting's applications under Auction 62 or otherwise to the Commission.  As such, the Commission did not receive the full auction price to which it was entitled.

64.     Further, contrary to the certification made on Newman Broadcasting's Form 301, Cesta Newman was involved and had an attributable interest in the media interest of her husband.  For example, Ms. Newman was identified as Vice President and or Secretary of Newman Media on Florida Secretary of State documents from 1999 to 2004 and documents show that she had on-going involvement in Newman Media's interests after 2004.  For example, she was identified as Vice President of Newman Media in a 2007 Newman Media staff directory. Because of her  attributable interest in Newman Media, Ms. Newman and Newman Broadcasting would not have been entitled to a 35% bidding credit for this independent reason.

65.     Additionally, the Newmans jointly held ownership interests in a third-party, Altair Communication, Inc., with Cesta being its Vice President and John being its President.  Although this joint ownership of another entity would have been relevant to the Commission's assessment of control and attributable interests, neither Cesta nor John disclosed this relationship to the Commission.

**D.     Defendants' Camouflaged Their Wrongful Conduct by Continuing to Hide Mr. Newman's and Newman Media's Involvement in Newman Broadcasting in Periodic Submission to the Commission.**

66.     Defendants continued to make false statements to the Commission by failing to disclose their attributable interests and those of John Newman and Newman Media on Defendants' Ownership Reports for Commercial Broadcast Stations (Form FCC 323) submitted on or around October 22, 2006; September 25, 2007; July 2, 2010; and October 1, 2011.

67.     That is, on each of these forms Cesta Newman on behalf of Newman Broadcasting listed only herself and Newman Broadcasting as persons having attributable interests in or control over the operations Newman Broadcasting, when in fact, as set forth above, Mr. Newman and Newman Media had substantial involvement in Newman Broadcasting's operations.

68.     The false statements and omissions on Newman Broadcasting's Form FCC 323s were material because it deprived the Commission of learning the true nature of Mr. Newman's and Newman Media's involvement in Newman Broadcasting, and the true involvement of Mr. Newman and Newman Media in Newman Broadcasting rendered Newman Broadcasting ineligible for the bidding credit it received and/or made it liable to return all or a portion of that credit under the Commission's unjust enrichment rules set forth above.

**COUNT I -- FALSE CLAIMS ACT -- FALSE CLAIMS**
**31 U.S.C. § 3729(a)(1)(A)**
(By the United States Against All Defendants)

69.     The United States incorporates by reference the allegations set forth in Paragraphs 1 to 67 above as if fully set forth herein.

70.     As described above, Defendants presented, or caused to be presented, for payment or approval, a false or fraudulent claim (*i.e.*, a claim for a new entrant bidding credit valued at $910,700) to the United States as it failed to describe the true nature of Mr. Newman's and Newman Media's involvement and interests in Newman Broadcasting.

71.     Defendants knew this claim was false as they knew the true nature of Newman Broadcasting's operations.

72.     The United States approved a bidding credit to which Defendants were not entitled because of Defendants' falsehoods and incurred damages as a result.

73.     Accordingly, Defendants are liable to the Government for a civil penalty of not less than $5,500 and not more than $11,000 for each false claim and three times the amount of all damages sustained by the United States because of Defendants' false claim.

## COUNT II -- FALSE CLAIMS ACT -- FALSE STATEMENTS
### 31 U.S.C. § 3729(a)(1)(B)
(By the United States All Defendants)

74.     The United States incorporates by reference the allegations set forth in Paragraphs 1 to 67 above as if fully set forth herein.

75.     Defendants knowingly made, used, or caused to be made or used, false records or statements to obtain designated entity status for Newman Broadcasting, and get a false or fraudulent claim (in the form of a new entrant bidding credit valued at $910,700) paid or approved by the United States.

76.     Specifically, as detailed above, in numerous submissions to the Commission, Defendants falsely stated the nature of Mr. Newman's and Newman Media's involvement and interests in Newman Broadcasting.

77.     Defendants knew these statements were false as they knew the true nature of Newman Broadcasting's operations.

78.     The United States approved a bidding credit to which Defendants were not entitled because of Defendants' falsehoods and incurred damages as a result.

79.     Accordingly, Defendants are liable to the Government for a civil penalty of not less than $5,500 and not more than $11,000 for each false claim and three times the amount of all damages sustained by the United States because of Defendants' false claim.

## COUNT III -- FALSE CLAIMS ACT -- REVERSE FALSE CLAIMS
### 31 U.S.C. § 3729(a)(1)(G)
(By the United States Against All Defendants)

80.     The United States incorporates by reference the allegations set forth in Paragraphs 1 to 67 above as if fully set forth herein.

81.     Defendants knowingly made, used, or caused to be made or used, false records and/or statements to conceal, avoid or decrease their obligation to pay or transmit money or

property to the United States -- namely by failing, including through its Form FCC 323s, to disclose the true nature of Mr. Newman's and Newman Media's involvement and interests in Newman Broadcasting, which would have rendered it ineligible for all or part of the bidding credit it received.

82.     Accordingly, Defendants are liable to the Government for a civil penalty of not less than $5,500 and not more than $11,000 for each false claim and three times the amount of all damages sustained by the United States because of Defendants' false claim.

## COUNT IV -- COMMON LAW -- BREACH OF CONTRACT
### (By the United States Against Newman Broadcasting)

83.     The United States incorporates by reference the allegations set forth in Paragraphs 1 to 67 above as if fully set forth herein.

84.     The Commission and Newman Broadcasting entered into an agreement whereby the Commission provided Newman Broadcasting certain rights to certain radio frequencies and Newman Broadcasting agreed to pay a sum to the Commission less any bidding credit for which it was eligible.

85.     Newman Broadcasting materially breached that agreement by paying the Commission less than that called for by the parties' agreement -- *i.e*, the amount attributable to the bidding credit Newman Broadcasting received but for which it was ineligible.

86.     Accordingly, Newman Broadcasting is liable to the United States in an amount to be determined at trial, but approximately $910,700.

## COUNT V – COMMON LAW – UNJUST ENRICHMENT
### (By the United States Against All Defendants)

87.     The United States incorporates by reference the allegations set forth in Paragraphs 1 to 67 above as if fully set forth herein.

88.     By reason of the Government's approval of Newman Broadcasting's request for designated entity status and a new entrant bidding credit, Cesta Newman and Newman Broadcasting received a reduction in the cost of their broadcast construction permit and license to which they were not entitled and have thereby been unjustly enriched in amount to be determined at trial, but approximately $910,700.

*     *     *

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, the United States of America, prays for judgment against Defendants as follows:

A.     On Counts I to III, treble damages and civil penalties pursuant to the False Claims Act;

B.     On Count IV and V, money damages equally the amount of the bidding credit that Newman Broadcasting received from the Commission;

C.     Interest, costs, and other recoverable expenses permitted by law; and

D.     Such other relief as may be just and appropriate.

### **The United States Demands A Trial By Jury On All Claims So Triable**

Dated: June 16, 2016
          Washington, DC

Respectfully submitted,

CHANNING D. PHILLIPS, D.C. Bar #415793
United States Attorney

DANIEL F. VAN HORN, D.C. Bar #924092
Chief, Civil Division


By: _____/s/_____
          BRIAN P. HUDAK
          Assistant United States Attorney
          555 Fourth Street, NW
          Washington, DC 20530
          (202) 252-2549

*Attorneys for the United States of America*