**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| UNITED STATES OF AMERICA, |
|     Plaintiff |
|     v. |
| CESTA D. NEWMAN, *et al*., |
|     Defendants |

Civil Action No. 16-1169 (CKK)

**MEMORANDUM OPINION**
(August 17, 2017)

In this False Claims Act ("FCA") case, the government alleges that Defendants Cesta Newman and Newman Broadcasting Inc.[1] wrongfully obtained a "new entrant bidding credit" from the Federal Communications Commission ("FCC") that reduced the cost of a license for Newman Broadcasting to construct and operate a radio station. To be eligible for this type of credit, an FCC licensee must have limited or no other mass media interests. The gravamen of the government's complaint is that Defendants falsely represented that they were eligible for the credit despite the fact that Cesta Newman was already involved in other radio stations owned by her late husband, John Newman, and that John Newman was the real force behind Newman Broadcasting.

Before the Court is Defendants' [10] Motion to Dismiss the Complaint. Defendants argue that the government's claims are barred by the FCA's statute of limitations and also that the government failed to satisfy the applicable pleading standards. Upon consideration of the

---

[1] Newman Broadcasting, Inc. was apparently known as ABC Media, Inc. during some of the periods in which the events at issue in this case took place. Regardless, in keeping with the approach of the parties, the Court will refer to the entity throughout this Memorandum Opinion as "Newman Broadcasting" to avoid confusion.

pleadings,[2] the relevant legal authorities, and the record as a whole, the Court DENIES

Defendants' motion.

## I. BACKGROUND

### A.  The Communications Act and Related FCC Regulations

Under the Communications Act of 1934 ("Communications Act"), the FCC is authorized

to award licenses for rights to use the radio spectrum through competitive bidding.  The

Communications Act also sets forth certain objectives the FCC is to consider when establishing

the bidding processes for those licenses.  Section 309(j) of the Communications Act states that

the FCC must, among other things, "ensure that small businesses, rural telephone companies, and

businesses owned by members of minority groups and women are given the opportunity to

participate in the provision of spectrum-based services, and, for such purposes, consider the use

of tax certificates, bidding preferences, and other procedures."  47 U.S.C. § 309(j)(4)(D).

Similarly, Section 309(j) states that the FCC should design a system of competitive bidding that

promotes "economic opportunity and competition . . . by avoiding excessive concentration of

licenses and by disseminating licenses among a wide variety of applicants, including small

businesses, rural telephone companies, and businesses owned by members of minority groups

and women."  *Id.* § 309(j)(3)(B).

To further these goals, the FCC established the "new entrant bidding credit."  *See*

*generally In the Matter of Implementation of Section 309(j) of the Commc'ns Act - Competitive*

---

[2] The Court's consideration has focused on the following documents:
- Defs.' Mot. to Dismiss the Compl. ("Defs.' Mot."), ECF No. 10;
- United States' Mem. in Opp'n to Mot. to Dismiss ("Gov.'s Opp'n"), ECF No. 13; and
- Defs.' Reply Mem. in Support of Mot. to Dismiss the Compl. ("Defs.' Reply"), ECF No. 14.
In an exercise of its discretion, the Court finds that holding oral argument in this action would
not be of assistance in rendering a decision.  *See* LCvR 7(f).

*Bidding for Commercial Broad. & Instructional Television Fixed Serv. Licenses*, 13 F.C.C. Rcd. 15920 (1998) (discussing the adoption of the new entrant bidding credit). The implementing FCC regulations provide that "[a] winning bidder that qualifies as a 'new entrant' may use a bidding credit to lower the cost of its winning bid on any broadcast construction permit." 47 C.F.R. § 73.5007(a). As relevant to this case in particular, the regulations state that "[a] thirty-five (35) percent bidding credit will be given to a winning bidder if it, and/or any individual or entity with an attributable interest in the winning bidder, have no attributable interest in any other media of mass communications." *Id.* As a corollary, the new entrant bidding credit is "not available to a winning bidder if it, and/or any individual or entity with an attributable interest in the winning bidder, have an attributable interest in any existing media of mass communications in the same area as the proposed broadcast or secondary broadcast facility." 47 C.F.R. § 73.5007(b). "Any winning bidder claiming new entrant status must have de facto, as well as de jure, control of the entity utilizing the bidding credit." 47 C.F.R. § 73.5007(a).

**B. Public Notice of Auction 62**

On June 17, 2005, the FCC published a Public Notice for the auction of 172 FM radio construction permits in the United States and United States Virgin Islands ("Auction 62"). *See generally Auction of FM Broad. Constr. Permits Scheduled for Nov. 1, 2005*, 20 F.C.C. Rcd. 10492 (2005). The Public Notice contained a section entitled "New Entrant Bidding Credit." *Id.* at 10507. That section stated that "[t]o fulfill its obligations under Section 309(j) and further its long-standing commitment to the diversification of broadcast facility ownership, the Commission adopted a tiered New Entrant Bidding Credit for broadcast auction applicants with no, or very few, other media interests." *Id.* The Notice required applicants seeking this new entrant bidding credit to certify on their applications for Auction 62 that they satisfied the

eligibility requirements for the credit. *Id.* at 10509. In accordance with the FCC regulations discussed above, the Notice informed applicants that "[a] 35 percent bidding credit will be given to a winning bidder if it, and/or any individual or entity with an attributable interest in the winning bidder, has no attributable interest in any other media of mass communications." *Id.*

The Notice also provided that "[i]n cases where a bidder's spouse or close family member holds other media interests, such interests are not automatically attributable to the bidder" and that "[t]he Commission decides attribution issues in this context based on certain factors traditionally considered relevant." *Id.* at 10508 (citing *Clarification of Comm'n Policies Regarding Spousal Attribution*, 7 F.C.C. Rcd. 1920 (1992)). Bidders for Auction 62 were "required to fully disclose information on the real party or parties-in-interest and ownership structure of the bidding entity." *Id.* at 10513. The Notice also stated that "unjust enrichment provisions appl[ied] to a winning bidder that utilizes a bidding credit and subsequently seeks to assign or transfer control of its license or construction permit to an entity not qualifying for the same level of bidding credit." *Id.* at 10509-10.

## C. Defendants' Bid on Auction 62

Auction 62 commenced on November 1, 2005. Compl., ECF No. 1, ¶ 37. On November 23, 2005, Defendant Cesta Newman bid on the auction on behalf of Newman Broadcasting by submitting a "short-form application" or "FCC Form 175." *Id.* ¶ 51. Defendant represented on that application that Newman Broadcasting was a "woman-owned business" entitled to a 35% new entrant bidding credit toward the cost of an FCC radio license. *Id.* ¶¶ 3, 51.

On March 10, 2006, Defendants submitted to the FCC a "long-form application" or "FCC Form 301." *Id.* ¶ 53. On that form, Defendant Cesta Newman represented that she was the president, director and stockholder of Newman Broadcasting and that Newman Broadcasting's

proposed FM facility would not present any issues under the FCC's policies regarding the media interests of family members. *Id.* Defendant allegedly "certified that no other entity or person had an interest in Newman Broadcasting that would vitiate the defendants' eligibility for designated entity status and a new entrant bidding credit." *Id.* ¶ 3. More specifically, Defendants allegedly represented that Defendant Cesta Newman's late husband, John Newman, and his company, Newman Media, Inc., had no involvement or interests in Newman Broadcasting. *Id.* ¶ 4. Defendant stated:

> CESTA D NEWMAN IS PRESIDENT AND 100% STOCKHOLDER OF THE APPLICANT. HER HUSBAND, JOHN R NEWMAN, IS PRESIDENT AND 100% STOCKHOLDER OF NEWMAN MEDIA, INC. NEWMAN MEDIA, INC. IS THE LICENSEE OF TWO RADIO STATIONS THAT SERVE THE SAME MARKET AS THE PROPOSED STATION. THEY ARE WNFB(FM) AND WDSR(AM), LAKE CITY, FLORIDA. NEITHER CESTA OR JOHN HAS ANY INVOLVEMENT OR INTERESTS IN THE MEDIA ENTERPRISES OF THE OTHER.

*Id.* ¶ 54. The FCC granted Newman Broadcasting's application on May 25, 2006, after receiving payment from the company of an amount equivalent to its gross bid less $910,700—the amount of a 35% new entrant bidding credit. *Id.* ¶¶ 57-58. Newman Broadcasting proceeded to construct a radio station with call sign WJTK. *Id.* ¶ 58.

The government contends that the representations and certifications on Defendants' applications were false. *Id.* ¶¶ 3-4. The government alleges that in reality John Newman and his company, Newman Media, had substantial involvement with Newman Broadcasting, and that the Defendants' representations to the contrary were made to avoid Mr. Newman, who already owned multiple radio stations in the area and accordingly would not have qualified for the new entrant bidding credit himself, having to pay the full cost of the license sought. *Id.* ¶¶ 5, 61.

The government alleges that "[c]ontrary to the certification made on Newman Broadcasting's Form 301, John Newman was involved in Newman Broadcasting and WJTK during and before the application phase." *Id.* ¶ 60. The government alleges that "the Newmans treated WJTK as a family enterprise rather than an independent entity controlled by Cesta Newman." *Id.* ¶ 62. The government provides examples of facts supporting its allegations, including that "John Newman and Newman Media were responsible for the physical set up of the radio station, WJTK," "John Newman essentially ran . . . Newman Broadcasting's WJTK," "John Newman primarily or exclusively made personnel decisions, proposed consolidating sales staff of the separate companies, set advertising rates, and prepared and distributed weekly agendas for the three radio stations," "John Newman conducted weekly staff meetings for Newman Broadcasting, which Cesta Newman only occasionally attended," "Cesta Newman's involvement in Newman Broadcasting, and its station WJTK, was limited or 'spotty' -- *e.g.*, she was involved in bookkeeping and participation in certain personnel decisions," and "[t]he three radio stations (Newman Broadcasting's WJTK, and Newman Media's WNFB, and WDSR) shared staff and common management and jointly sold advertising." *Id.*

The government additionally alleges that Cesta Newman's representation that she was not involved in the media interests of her husband were also false. The government alleges that she was Vice President and/or Secretary of Newman Media and had "on-going involvement" in that company. *Id.* ¶ 64.

After Newman Broadcasting received its license and WJTK was constructed, Defendants allegedly continued to repeat similar false representations regarding Mr. Newman's involvement in Newman Broadcasting in periodic reports submitted to the FCC. *Id.* ¶ 6. The government contends that Defendants falsely stated in biennial "Ownership Reports for Commercial

Broadcast Stations" or "FCC Form 323s" that Cesta Newman and Newman Broadcasting were the only persons with an attributable interest in or control over Newman Broadcasting.  *Id.* ¶¶ 66-67.

Based on the preceding allegations, the government asserts causes of action under the FCA for false claims (31 U.S.C. § 3729(a)(1)(A)), false statements (31 U.S.C. § 3729(a)(1)(B)), and reverse false claims (31 U.S.C. § 3729(a)(1)(G)), as well as common law causes of action for breach of contract and unjust enrichment.  *Id.* ¶¶ 69-88.  In the government's false claims cause of action, it asserts that Defendants' claim for a new entrant bidding credit was fraudulent because "it failed to describe the true nature of Mr. Newman's and Newman Media's involvement and interests in Newman Broadcasting."  *Id.* ¶ 70.  In the government's false statements cause of action, it asserts that Defendants' submissions to the FCC were false records or statements because they "falsely stated the nature of Mr. Newman's and Newman Media's involvement and interests in Newman Broadcasting."  *Id.* ¶ 76.  In the government's reverse false claims cause of action, it asserts that Newman Broadcasting "fail[ed], including through its Form FCC 323s, to disclose the true nature of Mr. Newman's and Newman Media's involvement and interests in Newman Broadcasting" in order to conceal its obligation to return the value of the new entrant bidding credit to the government.  *Id.* ¶ 81.  In the government's breach of contract cause of action, it asserts that the FCC and Newman Broadcasting entered into an agreement for the rights to the radio frequencies for WJTK, and Newman Broadcasting breached that agreement by paying the FCC less than what was called for by the parties' agreement.  *Id.* ¶¶ 84-85.  Finally, in the government's unjust enrichment cause of action, it asserts that Defendants were unjustly enriched when they received a reduction in the cost of their broadcast construction permit and license to which they were not entitled.  *Id.* ¶ 88.

Defendants have moved to dismiss the complaint in its entirety. That motion has been fully briefed and is ripe for resolution.

## II. LEGAL STANDARDS

### A. Subject Matter Jurisdiction under Rule 12(b)(1)

A court must dismiss a case pursuant to Federal Rule 12(b)(1) when it lacks subject matter jurisdiction. In determining whether there is jurisdiction, the Court may "consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Coalition for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003) (citations omitted); *see also Jerome Stevens Pharm., Inc. v. Food & Drug Admin.*, 402 F.3d 1249, 1253 (D.C. Cir. 2005) ("[T]he district court may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction."). "At the motion to dismiss stage, counseled complaints, as well as *pro se* complaints, are to be construed with sufficient liberality to afford all possible inferences favorable to the pleader on allegations of fact." *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1106 (D.C. Cir. 2005). In spite of the favorable inferences that a plaintiff receives on a motion to dismiss, it remains the plaintiff's burden to prove subject matter jurisdiction by a preponderance of the evidence. *Am. Farm Bureau v. Envtl. Prot. Agency*, 121 F. Supp. 2d 84, 90 (D.D.C. 2000). "Although a court must accept as true all factual allegations contained in the complaint when reviewing a motion to dismiss pursuant to Rule 12(b)(1), [a] plaintiff['s] factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim." *Wright v. Foreign Serv. Grievance Bd.*, 503 F. Supp. 2d 163, 170 (D.D.C. 2007) (internal citations and quotation marks omitted).

**B. Failure to State a Claim under Rule 12(b)(6)**

Pursuant to Federal Rule 12(b)(6), a party may move to dismiss a complaint on the grounds that it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "[A] complaint [does not] suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). Rather, a complaint must contain sufficient factual allegations that, if accepted as true, "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## III. DISCUSSION

Defendants move to dismiss the complaint on a number of different grounds. First, Defendants argue that most of the government's claims are barred by the statute of limitations. Second, Defendants claim that the government has not satisfied the heightened pleading standards of Federal Rule 9(b). Third, Defendants contend that the government cannot establish that their certifications of compliance with FCC regulations were knowingly false. Fourth, Defendants argue that the government cannot plausibly state a claim under the FCA's reverse false claims provision because Defendants had no obligation to return the new entrant bidding credit once it was received. And finally, Defendants argue that the government's unjust enrichment claim must be dismissed because it is inconsistent with the government's breach of contract claim. As the Court explains below, none of Defendants' arguments persuade the Court that the complaint, nor any claims therein, should be dismissed at this early stage of the case.

**A. Statute of Limitations**

Defendants' first argument is that counts one and two of the government's complaint (asserting FCA causes of action for false claims and false statements) should be dismissed pursuant to the FCA's statute of limitations. Under 31 U.S.C. § 3731(b), these claims "may not be brought (1) more than 6 years after the date on which the violation of section 3729 is committed, or (2) more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed, whichever occurs last."

Defendants contend that these counts are barred because they were filed outside of the three year statutory period that began to run "after the date when facts material to the right of action [were] known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances." According to the Defendants, the three year period began to run "in early 2011" when government officials became aware of the facts underpinning the allegations in this case. Defs.' Mot. at 13. The government's complaint was not filed until June 16, 2016. *Id.* The government disagrees with the factual premises of Defendants' argument, but also contends that this is not an argument that should be resolved at this stage of the case.

The Court agrees with the government that Defendants' statute of limitations defense is not properly resolved at the motion to dismiss stage. The fundamental problem with Defendants' argument at this time is that it is not supported by the allegations in the complaint. To establish the knowledge of relevant government officials in 2011, Defendants rely on two documents that they have attached to their motion to dismiss. One is an "inquiry letter" sent to Defendant

Newman by the Special Counsel for the FCC's Enforcement Bureau on March 18, 2010. The letter states that the Enforcement Bureau of the FCC was investigating Newman Broadcasting's compliance with FCC rules regarding eligibility for the new entrant bidding credit in Auction 62. Defs.' Mot., Ex. C. The other document is an email chain suggesting that an FCC Enforcement Bureau attorney had sent materials relating to the FCC's investigation into Cesta Newman and Newman Broadcasting to the FCC Office of Inspector General in late 2010 or early 2011. Defs.' Mot., Ex. D.

It would be improper at the motion to dismiss stage for the Court to look beyond the allegations in the complaint and dismiss the government's claims based on this incomplete factual record. Defendants contend that the Court can consider materials beyond the complaint because the FCA's statute of limitations is a "jurisdictional" bar and accordingly Defendants' motion must be considered under Rule 12(b)(1). The Court disagrees. The Supreme Court has recently made clear that "Congress must do something special . . . to tag a statute of limitations as jurisdictional . . ." *United States v. Kwai Fun Wong*, 135 S. Ct. 1625, 1632 (2015). "[P]rocedural rules, including time bars, cabin a court's power only if Congress has 'clearly state[d]' as much." *Id.* (quoting *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 153 (2013)). In applying this "clear statement rule," the Supreme Court has "made plain that most time bars are nonjurisdictional." *Id.*

The FCA's statute of limitations is no exception. The statute does not contain any clear statement that it is meant to be jurisdictional. Statutes of limitations that are jurisdictional "speak about jurisdiction, or more generally phrased, about a court's powers." *Id.* at 1633 n.4. The FCA's statute of limitations, on the other hand, does not mention the court's jurisdiction or its power over any claim. It simply states that a "civil action . . . may not be brought" after certain

periods of time. This is insufficient. "When Congress wanted limitations on False Claims Act suits to operate with jurisdictional force, it said so explicitly," by, for example, directing that "*[n]o court shall have jurisdiction* over" certain types of actions. *U.S. ex rel. Heath v. AT & T, Inc.*, 791 F.3d 112, 120 (D.C. Cir. 2015), *cert. denied sub nom. AT&T, Inc. v. U.S. ex rel. Heath*, 136 S. Ct. 2505 (2016) (emphasis in original). Absent similar clear language suggesting a jurisdictional bar, the Court is unconvinced that the FCA statute of limitations was intended to be treated as jurisdictional. *Id.* at 121 n.4 (referring to discussion in recent Supreme Court opinion regarding the FCA's statute of limitations as addressing "a nonjurisdictional statute of limitations issue").

Because the FCA statute of limitations is not jurisdictional, Defendants' motion is appropriately reviewed under Rule 12(b)(6). *See United States ex rel. Sansbury v. LB & B Assocs., Inc.*, 58 F. Supp. 3d 37 (D.D.C. 2014) (analyzing FCA statute of limitations argument under the rubric of a Rule 12(b)(6) motion); *U.S. ex rel. Frascella v. Oracle Corp.*, 751 F. Supp. 2d 842 (E.D. Va. 2010) (same); *U.S. ex rel. Dugan v. ADT Sec. Servs., Inc.*, No. CIV.A.DKC 20033485, 2009 WL 3232080, at *3 (D. Md. Sept. 29, 2009) (citing cases) ("It appears . . . that the majority of courts treat the statute of limitations [under the FCA] as a failure to state a claim under Fed. R. Civ. P. 12(b)(6)"). Accordingly, the Court's focus is on the sufficiency of the allegations in the government's complaint. The Court will not consider at this stage of the case the inquiry letter or the email attached to Defendants' motion, which were neither attached to nor incorporated into the complaint. *See Stewart v. Nat'l Educ. Ass'n*, 471 F.3d 169, 173 (D.C. Cir. 2006) ("In determining whether a complaint states a claim, the court may consider the facts alleged in the complaint, documents attached thereto or incorporated therein, and matters of which it may take judicial notice."). Properly considered under the rubric of Rule 12(b)(6), the

parties' dispute regarding the statute of limitations is easily resolved. "There is an inherent problem in using a motion to dismiss for purposes of raising a statute of limitations defense." *Richards v. Mileski*, 662 F.2d 65, 73 (D.C. Cir. 1981). "Although it is true that a complaint sometimes discloses such defects on its face, it is more likely that the plaintiff can raise factual setoffs to such an affirmative defense." *Id.* As the D.C. Circuit has "repeatedly held, courts should hesitate to dismiss a complaint on statute of limitations grounds based solely on the face of the complaint." *Firestone v. Firestone*, 76 F.3d 1205, 1208-09 (D.C. Cir. 1996). "[A] district court can certainly grant a motion to dismiss on statute of limitations grounds, but to do so, the factual allegations in the complaint must clearly demonstrate all elements of the statute of limitations defense *and* that the plaintiff has no viable response to the defense." *United States ex rel. Landis v. Tailwind Sports Corp.*, 51 F. Supp. 3d 9, 38 (D.D.C. 2014) (emphasis in original).

The factual allegations in the complaint in this case do not clearly demonstrate that the government's claims are time barred. The complaint says nothing about the date when any government official learned or should have learned about the material facts in this case. Moreover, the complaint alleges that Defendants purposefully concealed the alleged fraud underlying the government's claims for years by submitting periodic false reports to the FCC, which could theoretically serve as a setoff to Defendants' statute of limitations defense. In light of these allegations, it would be improper to dismiss the complaint at this time on the basis of the FCA's statute of limitations.[3]

---

[3] Defendants argue for the first time in their reply brief that similar statute of limitations arguments demand dismissal of the government's common law counts as well. Defs.' Reply at 13. As an initial matter, the Court does not consider arguments raised for the first time in reply. *See United States v. Dynamic Visions, Inc.,* No. CV 11-695 (CKK), 2017 WL 1476102, at *4 (D.D.C. Apr. 24, 2017) ("'[I]t is a well-settled prudential doctrine that courts generally will not entertain new arguments first raised in a reply brief.'") (quoting *Aleutian Pribilof Islands Ass'n,*

The Court also declines Defendants' invitation to treat its motion as one for summary judgment prior to any discovery having been conducted, or to delay this case moving forward by ordering limited discovery be conducted on the timeliness issue alone. Defendants will have an opportunity to raise their statute of limitations arguments in a summary judgment motion after the discovery period closes, if they so choose.[4]

## B. Federal Rule 9(b)

Defendants next argue that counts one and two should be dismissed because the allegations in the complaint do not satisfy the heightened pleading standards of Federal Rule 9(b). "Complaints brought under the FCA must . . . comply with Rule 9(b)." *Tailwind Sports*, 51 F. Supp. 3d at 49. Rule 9(b) states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." "Reading Rule 9(b) together with Rule 8's requirement that allegations be 'short and plain,' . . . the D.C. Circuit has required plaintiffs to 'state the time, place and content of the false misrepresentations, the fact misrepresented and what was retained or given up as a consequence of the fraud,' and to 'identify individuals allegedly involved in the fraud.'" *United States ex rel. Morsell v. Symantec Corp.*, 130 F. Supp. 3d 106, 117 (D.D.C. 2015) (citing *United States ex rel. Williams v. Martin-Baker Aircraft Co., Ltd.,* 389 F.3d 1251, 1256 (D.C. Cir. 2004)). "Put more colloquially, an FCA plaintiff must identify the 'who, what, when, where, and how of the alleged fraud.'" *United*

---

*Inc. v. Kempthorne*, 537 F. Supp. 2d 1, 12 n.5 (D.D.C. 2008)). Regardless, even if the Court were to consider this argument, it would fail for all of the same reasons that Defendants' FCA statute of limitations argument failed at this stage in the case.

[4] Because the Court assesses Defendants' statute of limitations argument under Rule 12(b)(6) and rejects it based on the allegations in the complaint, the Court need not reach the parties' factual disputes about the application of 31 U.S.C. § 3731(b), including their dispute over who could qualify as an "official of the United States charged with responsibility to act in the circumstances" in this case.

*States v. Kellogg Brown & Root Servs., Inc.*, 800 F. Supp. 2d 143, 153 (D.D.C. 2011) (quoting *U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008)).

The government's allegations satisfy these requirements. As laid out in more detail in the background section above, the government alleges that Defendant Cesta Newman, on behalf of Defendant Newman Broadcasting, made specific misrepresentations and certifications regarding the degree of John Newman's involvement with Newman Broadcasting, Cesta Newman's involvement in John Newman's media holdings, and Newman Broadcasting's eligibility for a new entrant bidding credit, on particular forms filed with the FCC on particular dates. The government alleges that as a result of these misrepresentations, it gave Defendants a $910,700 credit toward the cost of a radio license that they were not entitled to. These allegations are sufficiently detailed to satisfy the purpose of Rule 9(b), namely, "to ensure that defendants have notice of the charges against them adequate to prepare a defense." *U.S. ex rel. Pogue v. Diabetes Treatment Centers of Am., Inc.*, 238 F. Supp. 2d 258, 267 (D.D.C. 2002).

Moreover, the Court is not persuaded by the Defendants' related argument that the government has improperly alleged only "fraud by hindsight." Defendants contend that "the government's position boils down to the following argument: (1) post-auction, Mr. Newman was impermissibly involved with WJTK; (2) when she filled out the Form 301 in 2006, [Cesta] Newman *must have known* that Mr. Newman would be impermissibly involved; (3) and therefore [Cesta] Newman's 2006 certification was fraudulent." Defs.' Mot. at 18 (emphasis in original). The Court disagrees with this characterization of the government's complaint. The government does include in its complaint allegations about John Newman's involvement in Newman Broadcasting after that company was awarded the license at issue and constructed the WJTK station, (*e.g.*, that John Newman was responsible for the physical set up, personnel decisions and

weekly staff meetings of WJTK), and those allegations are more detailed than the allegations about Mr. Newman's involvement predating the award of the license and the construction of WJTK. But the government does clearly allege that Mr. Newman was impermissibly involved at this earlier time as well. The government alleges that "[c]ontrary to the certification made on Newman Broadcasting's Form 301, John Newman was involved in Newman Broadcasting and WJTK *during and before the application phase*." Compl. ¶ 60 (emphasis added). It also alleges that "the construction permit application by Newman Broadcasting was submitted by or through Cesta Newman so that John Newman could avoid paying the full value of the license," and that "*[f]rom the application phase (or before)* through a period when WJTK was on the air, Mr. Newman exercised control over Newman Broadcasting and WJTK." *Id.* ¶¶ 7, 62 (emphasis added). To the extent the allegations about this earlier period do not include specific facts about Mr. Newman's involvement in the day-to-day operation of the WJTK radio station, this is obviously a result of the fact that the station had not yet been constructed at that time.

Whether the government will be able to prove its allegations of fraud is clearly another matter, but the Court is not convinced that Rule 9(b) or Defendants' "fraud by hindsight" argument are proper grounds upon which to dismiss the government's FCA claims at the pleading stage.

## C. Knowing Falsity

Defendants next move to dismiss all of the government's FCA causes of action for failure to state a claim because "[t]he complaint fails to allege specific facts that would permit an inference that [Cesta] Newman's application was knowingly false." Defs.' Mot. at 19. Citing "ambiguous guidance" in various FCC forms and publications, Defendants argue that Cesta Newman's certification that Newman Broadcasting was eligible for a new entrant bidding credit

because "no other individual had an attributable interest in—or control over" that company could not have been "knowingly false" because it was based on her "objectively reasonable interpretation" of FCC regulations. *Id.* at 1, 19-23.

The Court rejects this argument as well. As an initial matter, the Court notes that Defendants' argument assumes that the only falsehood alleged in the complaint is Defendants' certification that Newman Broadcasting was eligible for the new entrant bidding credit under FCC regulations. This is not so. "There are two overarching ways [the government] may demonstrate falsity." *United States v. Dynamic Visions, Inc.*, 216 F. Supp. 3d 1, 14 (D.D.C. 2016). "The first is factual falsity: '[i]n the paradigmatic case, a claim is false because it involves an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided.'" *Id.* (quoting *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1266 (D.C. Cir. 2010)) (internal quotation omitted). In other words, a claim may be false because the "claimant submits information that is untrue on its face." *Kellogg Brown*, 800 F. Supp. 2d at 154. "The second way a claim may be false is if it falsely certifies compliance with an applicable statute, regulation or contract." *Dynamic Visions, Inc.*, 216 F. Supp. 3d at 14. Defendants' "objectively reasonable interpretation" argument is relevant only to this latter category of falsity—*i.e.*, Defendants' allegedly false legal certification that Newman Broadcasting was eligible for a new entrant bidding credit under FCC regulations. It is not relevant to the government's distinct allegations of *factual* falsity: that is, the allegations that Defendants made *factually* false statements about John Newman and Cesta Newman's involvement in each other's media interests. *See, e.g.*, Compl. ¶ 54.

Moreover, even with respect to Defendants' allegedly false certifications of compliance with FCC regulations, Defendants' argument about knowing falsity is incapable of resolution at

the pleading stage. It is true that "[t]o be liable under the FCA, a defendant must have made the false claims knowingly," and that, accordingly, "the FCA does not reach an innocent, good-faith mistake about the meaning of an applicable rule or regulation," nor "claims made based on reasonable but erroneous interpretations of a defendant's legal obligations." *U.S. ex rel. Purcell v. MWI Corp.*, 807 F.3d 281, 287-88 (D.C. Cir. 2015), *cert. denied*, 137 S. Ct. 625 (2017). However, the complaint—which is the Court's focus at this stage of the case—says nothing about whether Defendant held or acted on any particular interpretation of the regulations at issue that might justify her certifications. To the contrary, the complaint alleges that Defendant *knew* her claims and statements were false. Compl. ¶¶ 71, 77. Defendant's allegedly reasonable interpretation of FCC regulations may eventually prevent the government from proving knowing falsity in this case, but the argument requires the development of a factual record. The Court will not dismiss this case at the outset merely because the allegations in the complaint are rebutted by assertions about Defendant's state of mind in her briefing on her motion to dismiss. *See United States ex rel. Wood v. Allergan, Inc.*, No. 10-CV-5645 (JMF), 2017 WL 1233991, at *36 (S.D.N.Y. Mar. 31, 2017) (declining to dismiss FCA claims on the basis of defendant's purportedly reasonable interpretation of regulation because "[a]t a minimum, [it] raise[d] questions of fact that cannot be resolved at this stage of the proceedings") (citing cases); *U.S. ex rel. Nevyas v. Allergan, Inc.*, No. CIV.A. 09-432, 2015 WL 4064629, at *6 (E.D. Pa. July 2, 2015) (holding that defendant's "reasonable interpretation of the law and applicable regulatory framework may well be a defense to liability, but it is not appropriate at the motion to dismiss stage when there are reasonable interpretations to the contrary.").

Moreover, even if the Court were able to accept as true the statements of defense counsel that Defendant in fact held a particular understanding of the regulation, *and* the Court were to

agree that her interpretation was reasonable, the complaint would still not fail as a matter of law at the pleading stage because a defendant's reasonable interpretation of a regulation is but one factor that affects whether Defendant made a knowingly false claim. "[E]ven if the meaning of" a regulation "is ambiguous and [defendant's] interpretation is reasonable, there remains the question whether [defendant] had been warned away from that interpretation." *Purcell,* 807 F.3d at 288. In other words, Defendants could still be found to have acted knowingly even if the Court were to find that their purported interpretation of the regulations at issue was reasonable. *See United States ex rel. Phalp v. Lincare Holdings, Inc.*, 857 F.3d 1148, 1155 (11th Cir. 2017) ("scienter is not determined by the ambiguity of a regulation, and can exist even if a defendant's interpretation is reasonable."); *United States ex rel. Chilcott v. KBR, Inc.*, No. 09-CV-4018, 2013 WL 5781660, at *6 (C.D. Ill. Oct. 25, 2013) ("While it is true that an innocent misinterpretation or a disputed interpretation of a contract cannot, *standing alone,* support a FCA claim, a deliberate or knowing misinterpretation, even if 'reasonable,' can give rise to FCA liability."). For this additional reason, Defendants' reasonable interpretation argument clearly cannot be resolved at the pleading stage. The Court will accordingly not dismiss the government's FCA claims for failure to alleged knowing falsity at this time.[5]

---

[5] Defendants argue that the government's breach of contract claim fails "[f]or the same reasons that the government has failed to plead a viable FCA cause of action." Defs.' Mot. at 27. In other words, Defendants contend that this claim fails because "the government has failed to plead facts to show that [Cesta] Newman was ineligible for the" new entrant bidding credit. *Id.* Because the Court has rejected that argument in the context of Defendants' FCA claims, Defendants' motion to dismiss the breach of contract claim premised on this same argument likewise fails.

### D. Reverse False Claims

Defendants also move to dismiss the government's claim under the "reverse false claims" provision of the FCA. A reverse false claim arises when a person "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G).[6] In other words, "[a] reverse false claim is any fraudulent conduct that 'results in no payment to the government when a payment is obligated.'" *Pencheng Si v. Laogai Research Found.*, 71 F. Supp. 3d 73, 88 (D.D.C. 2014) (quoting *Hoyte v. Am. Nat'l Red Cross,* 518 F.3d 61, 63 n.1 (D.C. Cir. 2008)) (internal quotations omitted). "Whereas a traditional false claim action involves a false or fraudulent statement made to the government to support a claim for money from the government, a typical reverse false claim action involves a defendant knowingly making a false statement in order to *avoid* having to pay the government when payment is otherwise due." *Id.*

The government's theory, in addition to claiming that Defendants fraudulently obtained the new entrant bidding credit in the first instance, is that Newman Broadcasting also "fail[ed], including through its Form FCC 323s, to disclose the true nature of Mr. Newman's and Newman Media's involvement and interests in Newman Broadcasting" in order to conceal its obligation to *return* the value of the new entrant bidding credit it had received. Compl. ¶ 81. The parties' main dispute with respect to this claim is whether the government can establish that Defendants

---

[6] The Fraud Enforcement and Recovery Act of 2009 ("FERA"), Pub.L. No. 111–21, 123 stat. 1617, amended the FCA in part by broadening the scope of the reverse false claims provision. There appears to be some dispute as to which version of the provision should apply in this case, but the Court need not resolve that dispute because the amendments do not affect the Court's conclusion that the government has adequately pled a reverse false claim cause of action.

had an "obligation" to return the credit. The term "obligation" is defined by statute as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3).

As an initial matter, the allegation that Defendants fraudulently concealed their original false claim for a new entrant bidding credit and thereby prevented the government from discovering that fraud is not by itself enough to establish an "obligation" to return the credit for the purposes of a reverse false claim action. If this were all that was required to state such a claim, "just about *any* traditional false statement or presentment action would give rise to a reverse false claim action; after all, presumably any false statement actionable under sections 3729(a)(1)(A) or 3729(a)(1)(B) could theoretically trigger an obligation to repay the fraudulently obtained money." *Pencheng Si*, 71 F. Supp. 3d at 97. "[I]f the conduct that gives rise to a traditional presentment or false statement action also satisfies the demands of section 3729(a)(1)(G), then there would be nothing 'reverse' about an action brought under that latter section of the FCA." *Id.*; *see also United States ex rel. Scollick v. Narula*, 215 F. Supp. 3d 26, 44 (D.D.C. 2016) (rejecting reverse false claim based on "assertion that the defendants retained government funds that they knew were obtained as a result of fraud" because "plaintiff-relator may not argue that an obligation to pay the government arose solely [out] of the concealment of fraudulent activity"); *United States ex rel. Landis v. Tailwind Sports Corp.*, 160 F. Supp. 3d 253, 270 (D.D.C. 2016) ("it is . . . black-letter law that one does not incur reverse-false-claim liability by violating, and affirmatively concealing one's violation of, a statute, regulation, or contract that merely authorizes the Government to levy certain fines and penalties").

Instead, to state a claim under the reverse false claim provision in this case, the government needed to identify some established duty of the Defendants to *return* the amount of the credit to the government after it was obtained. The Court is satisfied at this early stage in the case that the government has done so. The government has identified a series of regulations that require FCC licensees to report certain events concerning their eligibility for bidding credits and, if they become ineligible for a credit after receiving it, to repay the amount of the unwarranted credit to the government. Specifically, designated entities are required to seek FCC approval for certain "reportable eligibility events," including "[a]ny . . . event[s] that would lead to a change in the eligibility of a licensee for designated entity benefits." 47 C.F.R. § 1.2114(a). Additionally, "[i]f, within the initial term of the license, a licensee that utilizes a bidding credit seeks to make any ownership change that would result in the licensee losing eligibility for a bidding credit (or qualifying for a lower bidding credit), the amount of the bidding credit (or the difference between the bidding credit originally obtained and the bidding credit for which the licensee would qualify after restructuring), plus interest . . . must be paid to the U.S. Government as a condition of Commission approval of the assignment or transfer or of a reportable eligibility event." 47 C.F.R. § 1.2111(b)(1). Similar repayment requirements are triggered if the licensee "assign[s] or transfer[s] control of a license to an entity." *Id.*; *see also* 47 C.F.R. § 73.5007(c) (unjust enrichment provision specific to new entrant bidding credit). The Public Notice for Auction 62 called bidders' attention to these rules by stating that "[p]rospective bidders are reminded . . . that events occurring after the short-form filing deadline, such as the acquisition of attributable interests in media of mass communications, may cause diminishment or loss of the bidding credit, and must be reported immediately." *Auction of Fm Broad. Constr. Permits Scheduled for Nov. 1, 2005*, 20 F.C.C. Rcd. 10492, 10508 (2005).

The Court is satisfied that these regulations created an obligation that could plausibly have required Defendants to return the new entrant bidding credit to the government, and that Defendants' concealment of this obligation can serve as the basis for a reverse false claim action. Under these regulations, if control or ownership of Newman Broadcasting shifted to Mr. Newman at some point after Defendants were granted their new entrant bidding credit, this could have created an obligation on the part of the Defendants to repay the credit.

Defendants raise a number of arguments about the nature of this obligation, but none convince the Court that the reverse false claim count needs to be dismissed at this time. First, although it has been held that "[c]ontingent obligations—those that will arise only after the exercise of discretion by government actors—are not contemplated by the [FCA]," *Am. Textile Mfrs. Inst., Inc. v. The Ltd., Inc.*, 190 F.3d 729, 738 (6th Cir. 1999), the obligation created by the above-cited regulations does not appear to have been contingent on any act being taken by the government. The regulations simply required Defendants return the credit under certain circumstances. Second, Defendants argue that "the plain language of the unjust enrichment provision makes clear that it is discretionary in some circumstances" because "[a] licensee who utilizes a new entrant bidding credit and subsequently acquires an additional broadcast facility" would generally not be required under the provisions to reimburse the government the amount of the credit. Defs.' Reply at 4. The problem with this argument is that the government does not contend that Defendants' obligation to return the bidding credit arose because Defendant Newman "acquire[d] an additional broadcast facility." The government argues that the duty arose because of Mr. Newman's involvement in Newman Broadcasting. Third, Defendants also argue that "[t]here is no evidence . . . to suggest that the unjust enrichment provision is applicable in [Cesta] Newman's situation" and that "Defendants cannot find a single example of

a licensee reimbursing the FCC for the bidding credit because of a post-auction change in de facto control or attribution." Defs.' Reply at 2. This argument, like many of Defendants' other arguments, is simply not persuasive at the pleading stage. The Court will not dismiss the government's claim on the basis of a purported absence of such "evidence" or "examples" before the factual record has been developed at all.

Finally, the Court notes that the government's assertion that these regulations triggered a duty on the part of the Defendants to repay the new entrant bidding credit when Mr. Newman became so involved in Newman Broadcasting that the company ceased to be eligible for the credit is somewhat at odds with the government's other theory of relief—that the company was not eligible for the credit to begin with. However, the government is entitled to plead in the alternative, and the Court will not dismiss the reverse false claim count at this time on the basis of this inconsistency.[7]

**E.  Unjust Enrichment**

Lastly, Defendants argue that the government's unjust enrichment claim must be dismissed because it is inconsistent with the government's assertion of a breach of contract claim. Defendants rely on the proposition that, "[a]s the D.C. Circuit has explained, 'there can

---

[7] Defendants also make a cursory argument about materiality in their motion to dismiss. Defendants contend that the government has failed to allege materiality because "[t]he decision to award a new entrant bidding credit had nothing to do with whether the bidder was a woman-owned, minority-owned, or rural businesses." Defs.' Mot. at 23. This may be so—the Public Notice for Auction 62 stated that "while 'Applicants owned by minorities or women' could report this status on the Form 175, this information about designated entity status was being collected for 'statistical purposes only.'" *Id.* However, the argument nonetheless misses the mark because the government does not claim that Defendants lied about whether Newman Broadcasting was "woman-owned, minority-owned or [a] rural business." The government claims that Defendants falsely represented the degree of involvement Mr. and Mrs. Newman had with each other's business interests, and Newman Broadcasting's eligibility for a new entrant bidding credit. The materiality of *these* representations has been adequately alleged.

be no claim for unjust enrichment when an express contract exists between the parties.'"

*Kellogg Brown*, 800 F. Supp. 2d at 160 (quoting *Albrecht v. Comm. on Employee Benefits of the Fed. Reserve Employee Benefits Sys.,* 357 F.3d 62, 69 (D.C. Cir. 2004)).  Although this proposition is undoubtedly correct, it is also correct that at this stage in the case the government is entitled to plead multiple claims based on alternative theories of relief.  *See McWilliams Ballard, Inc. v. Broadway Mgmt. Co.,* 636 F. Supp. 2d 1, 9 n.10 (D.D.C. 2009); *Nevius v. Africa Inland Mission Int'l,* 511 F. Supp. 2d 114, 122 n.6 (D.D.C. 2007); *see also* Fed. R. Civ. P. 8 (permitting pleading in the alternative).  Although in some instances courts have dismissed unjust enrichment claims at the pleading stage where there was no dispute as to the existence of a valid express contract between the parties, *see, e.g.*, *Kellogg Brown*, 800 F. Supp. 2d at 160 (dismissing unjust enrichment claim where there was no "allegation that there [was] no valid contract"), such an approach would not be appropriate in this case.  The government has called the validity of its supposed contract with the Defendants into question by alleging that it would not have agreed to the terms of that contract if Defendants had not fraudulently concealed certain facts from it.  In this context, the best course of action is to allow the government to proceed with its breach of contract and unjust enrichment claims as alternative theories of relief.  *See United States ex rel. Shemesh v. CA, Inc.*, 89 F. Supp. 3d 67, 80 (D.D.C. 2015) (denying motion to dismiss unjust enrichment claim despite allegation of express contract because "the government has alleged that its contract with [Defendant] may be invalid because it would not have entered into it but for [Defendant's] fraudulent conduct.").  The Court's ruling applies only to whether the government is entitled to *plead* its unjust enrichment claim.  Ultimately, of course, the government may not "recover on inconsistent theories of liability."  *Harvey v. Kasco*, 109 F. Supp. 3d 173, 178 (D.D.C. 2015).

**IV. CONCLUSION**

For the foregoing reasons, the Court DENIES Defendants' [10] Motion to Dismiss.  An appropriate Order accompanies this Memorandum Opinion.

                                        /s/
                                        COLLEEN KOLLAR-KOTELLY
                                        United States District Judge